**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | **CRIMINAL NO.   24-201** |
| | ) | |
| v. | ) | |
| **DREW GORDON,** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

### I.    <u>Introduction</u>

Defendant Drew Gordon ("Gordon") is charged in the second superseding indictment (ECF No. 91) with: (1) attempt to kill a Drug Enforcement Agency ("DEA") agent, 18 U.S.C. §§ 1113, 1114; (2) intentional assault on a DEA agent with a deadly and dangerous weapon, 18 U.S.C. §§ 111(a)(1) and (b); (3)  discharge of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(i) and (iii); (4) possession with intent to distribute 40 grams or more of fentanyl, 28 grams or more of cocaine base, and a quantity of cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii), (b)(1)(B)(vi) and (b)(1)(C); and (5) possessing a firearm in furtherance of drug trafficking, § 924(c)(1)(A)(i).  A trial scheduling order is in place, with jury selection and trial set to commence on October 19, 2026 (ECF No. 72).

Gordon filed numerous pretrial motions on January 20, 2026, including a motion to suppress evidence (ECF No. 64). The government filed an omnibus response to the motions (ECF No. 66).  Gordon filed a reply (ECF No. 75).

On April 2, 2026, the court held an evidentiary hearing.  (Transcript, ECF No. 80).  The court held oral argument on the motions on April 7, 2026, and resolved all pretrial motions, except for the motion to suppress evidence. (Transcript, ECF No. 87).  With respect to the

motion to suppress, the court directed the parties to file proposed findings of fact and conclusions of law, and permitted defendant to file another motion to suppress evidence related to the seizure of Gordon's person.

On April 21, 2026, Defendant filed two motions, raising three arguments: (1) a motion to dismiss count 3 of the superseding indictment[1] (ECF No. 85); (2) a motion to suppress the gunshot residue test administered after Gordon was seized (ECF No. 86); and (3) a renewed motion for a *Franks* hearing (ECF No. 86). The government filed an omnibus response in opposition to the second round of pretrial motions (ECF No. 88). The parties filed their respective proposed findings of fact and conclusions of law with respect to the first motion to suppress (ECF Nos. 89, 90).

On May 26, 2026, the court held a hearing and argument on the second round of motions. Counsel for both sides agreed that the evidence presented at the April 2, 2026 hearing was also applicable to the new motion to suppress and no new evidence was presented. The court determined to issue a single opinion and order to resolve all remaining pretrial motions. The motions are ripe for disposition.

## II.    Findings of Fact

### A. Background

1. At the April 2, 2026 hearing, the government presented testimony from FBI Special Agent Samantha Keener ("Keener"), DEA Task Force Officer and Pittsburgh Police Detective Peter Glavach ("Glavach"), FBI Task Force Officer and Allegheny County

---

[1] Defendant's motion was filed on April 21, 2026. The second superseding indictment was filed on May 13, 2026. Because count 3 of the second superseding indictment is identical to count 3 of the first superseding indictment, the court understands that defendant's motion remains applicable.

Sheriff's Department Detective Lindsey Perry ("Perry"), US Marshals Service Task Force Officer and Allegheny County Police Detective Joshua Stegena ("Stegena"), and Allegheny County Police Detective Quoc Vo ("Vo").  Numerous government and defense exhibits were admitted into evidence (ECF No. 79-1).

**B.   Investigation Leading to the Controlled Buy on August 29, 2024**

2.   In August 2024, Perry met with a confidential human source ("CHS"), who provided information about three people from whom the CHS purchased narcotics.  Tr. at 72.

3.   One of those persons who was selling drugs was nicknamed "Drewskii."  The CHS did not know his real name, but provided his phone number and a social media photo of him.  Tr. 73.

4.   With that information, Perry explored social media to try to find more photos, ran the phone number through an app, and submitted an administrative subpoena on the phone number.  Tr. 74.

5.   On August 27, 2024, T-Mobile provided records showing that the phone number provided by the CHS was subscribed to by Gordon.  Tr. 11-12.

6.   The FBI Safe Streets Task Force planned to use the CHS to make a controlled purchase of narcotics on August 29, 2024, from one of the three persons identified by the CHS.  The CHS was unable to contact two of the persons, but was able to contact "Drewskii."  Tr. 17, 33, 76.

7.   Keener, FBI agent Brian Distelrath ("Distelrath"), and FBI agent Don Jones met with the CHS on August 29, 2024, to plan the controlled buy.  Tr. 17.  At the meeting, the CHS handed over a phone and agents confirmed that the call log and text messages reflected that the CHS had contacted the phone number subscribed to by Gordon.  Tr. 17-18.

8. Agents showed the CHS a Pennsylvania drivers license photo of Gordon[2] and the CHS positively identified the photo as the person the CHS knew as "Drewskii."  Tr. 18.

9. On August 29, 2025, shortly after noon, Perry sent two images of Gordon that she found on social media to agents who were setting up a controlled buy, with Gordon as the target.  Tr. 19, 75-77.

10. The CHS traveled to the location for the controlled buy.  On the way, agents overheard two conversations between the CHS and the target of the controlled buy, who explained he would be driving a red pickup truck.  Tr. 20-21.  The agents confirmed that the phone calls came from the phone number subscribed to by Gordon.  Tr. 25.

11. Agents observed a red Dodge Ram pickup truck, PA license plate ZXM-0086 (the "Red Ram"), arrive at the location of the controlled buy.  The CHS entered the passenger side of the Red Ram for a few minutes, reentered the CHS' vehicle, and drove away.  Tr. 22.

12. Agents were not able to see into the Red Ram.  Tr. 47.

13. Agents debriefed the CHS.  The CHS provided a quantity of suspected heroin or fentanyl and positively identified Drewskii as the person from whom the CHS purchased the drugs.  Tr. 25.

14. As a result of the controlled buy, Keener believed that Gordon sold narcotics to the CHS. Tr. 26.

---

[2] There was testimony that the photo was shown to the CHS absent biographical information.  Tr. 18.  The defense argued that there was other testimony that called into question whether the biographical information was shown to the CHS on the drivers license photo.  That dispute, however, is immaterial. The court ruled on that same issue not being material with respect to the first motion to suppress.  Tr., ECF No. 87 at 55-63.  Even if the photo shown had the biographical information on it, the outcome of this opinion would not change, for the following reasons: (1) the CHS had already shown a picture of Drewskii to the agents; (2) the CHS did not know Drewskii's name; and (3) the CHS previously provided Gordon's phone number to the agents, which the agents linked to Gordon prior to showing the CHS the drivers license photo.

15. Agents were unable to follow the Red Ram as it drove away from the controlled buy location.  Tr. 47-48.

16. As part of the investigation, agents were attempting to locate Gordon's residence.  An agent queried the CLEAR database and sent the controlled buy team an address of 2287 Avenue, Pittsburgh, PA 15210, as being associated with Gordon.  Tr. 23.  Approximately ten minutes after the controlled buy, a team member drove to that address and observed the Red Ram parked on the street outside that address.  Tr. 24-25.

C. **Investigation Prior to the Traffic Stop**

17. The next day, August 30, 2024, task force officers conducted surveillance of 2287 Valera Avenue and identified the Red Ram parked on the street outside that address on two separate occasions, at 8:22 a.m. and noon.  Tr. 27, 79.

18. Also on August 30, 2024, prior to lunchtime, other DEA agents, including DEA agent Ryan Palso ("Palso"), were conducting surveillance in the vicinity of Valera Avenue for an unrelated investigation.  Tr. 68.

19. At approximately 1:15 p.m., Palso reported to Glavach by phone that a red Dodge Ram pickup truck pulled up next to him on Valera Avenue, the driver was staring at him and the stare was weird.  Tr. 57-60.

20. Palso recited the license plate number to Glavach, who determined through the JNET system that the vehicle was an Enterprise rental vehicle.  Tr. 58.  Glavach ran the JNET search at 1:16 p.m.  Tr. 60.  At that time, Glavach did not know who rented the truck.  Tr. 68. At some point prior to the traffic stop, agents learned that the Red Ram was rented by Gordon's brother, Deandre Gordon.  Tr. 173.

21. Palso felt uncomfortable due to the driver's stare and drove to a different location. At approximately 1:25 p.m., as he drove away, while still on the phone to Glavach, Palso stated "there's the truck" and screamed "they're shooting at me." Tr. 60, 62.

22. Glavach could hear the shots being fired at Palso's vehicle. Tr. 61.

23. The shooting occurred on Maytide Street, which is in close proximity to Valera Avenue. Tr. 83-84.

24. The Pittsburgh ShotSpotter system sent out an alert seconds later. Tr. 61.

25. Glavach immediately (at approximately 1:25 p.m.) notified dispatch that a DEA agent was being shot at, gave a description of the Red Ram, including the license plate, from which the shots came and its direction of flight. Tr. 63. Palso did not tell Glavach who was driving the truck or how many people were in it. Tr. 68-69.

26. A "BOLO" notice was issued for the Red Ram, which contained the vehicle and license plate. Tr. 80, 81.

27. Perry and other agents were at a celebratory lunch when she received the BOLO notice at approximately 1:41 p.m. At 1:42 p.m., Perry received a message identifying the Red Ram as the "shooter vehicle." Perry immediately recognized the vehicle from the controlled purchase the day before. Tr. 81-82.

28. Perry knew the same vehicle was seen outside 2287 Valera Avenue about an hour and a half prior to the shooting. Tr. 82.

29. Perry and Detective Zach Vozza notified other numerous other law enforcement agencies and task force officers about the connection between Gordon, the Red Ram, and the controlled buy the day before, and headed to the scene. Tr. 83-84. Perry circulated photos of Gordon, as the possible actor. Tr. 85.

6

30. Perry circulated drivers license information about Gordon's brother, Deandre Gordon, as a possible associate.  Tr. 85-86.

31. Perry believed it was "very likely" that Gordon was involved in the shooting.  Tr. 98.

32. Stegena and Vo learned from the DEA, FBI, and other agencies that Gordon was believed to be the actor who shot at Palso.  Tr. 102-103.

33. Shortly before 1:30 p.m. on August 30, 2026, Vo was informed that Gordon was a suspect in the shooting.   Tr. 160.  Vo was familiar with Gordon from his prior work with the Pittsburgh Police Department.  Tr. 161.

34. Vo circulated recent social media photos of Gordon to his colleagues.  Tr. 162.

35. Vo drove to the area of the shooting hoping to intercept the Red Ram, and began searching for it.  He learned the Red Ram was found unoccupied in the area of Queenston Street and Yale Drive.  Tr. 163.

36. Stegena testified, based on his experience, that criminals often discard vehicles in areas close to a safe haven.  Tr. 107.

37. Vo had a list of addresses related to Gordon and determined that 2287 Valera Avenue was within walking distance of the location where the Red Ram was found.  Tr. 163.

38. Agents set up surveillance of the 2287 Valera Avenue home at approximately 2:45 p.m. Tr. 164, Defense Ex. A.

39. Minutes later, a white Volkswagen, which was registered to Demetrius Roach ("Roach"), arrived at that home.  Tr. 164.

40. Agents obtained a photo and confirmed that Roach was driving the white Volkswagen. Tr. 165.

7

41. Agents observed Roach reach under the driver's seat, retrieve a firearm, and go toward 2287 Valera Avenue.  At the same time, Gordon came out of the home onto the front porch, talked with Roach, and they both went into the home.  Tr. 165.

42. Roach came back out and went to his car.  When an uninvolved vehicle was driven down the street, Roach pulled out his firearm and took cover behind his car.  Tr. 165.

43. Based on Vo's training and experience, Vo thought that Roach believed he was a target and was being vigilant in case he had to use his firearm.  Tr. 165-66.

44. After the vehicle drove away, Roach put his gun back in his waistband and went back into the home.  Tr. 165-66.

45. Shortly after Roach entered the home a second time, a blue Volkswagen (the "blue car") arrived at 2287 Valera Avenue.  Stegena immediately ran  the registration and was able to determine that the blue car was registered to Deandre Gordon, defendant's brother.  Tr. 166.

46. Deandre Gordon remained in the blue car and in a few minutes, Gordon and Roach left the home and entered the blue car.  Tr. 166.

47. Despite the heat of an August afternoon, Gordon was wearing a hooded sweatshirt in an apparent attempt to hide his identity.  Tr. 111-12.

48. Gordon got in the front passenger seat.  Tr. 111.

**D.  The Traffic Stop**

49. Agents followed the blue car and tried to arrange support from other agents to execute a "high risk" traffic stop due to having seen Roach with a gun and believing Gordon earlier shot at Palso.  Tr. 119.

50. Vo observed that the driver's side taillight/brake light of the blue car was not working, which was a violation of Pennsylvania's traffic code.  Tr. 167.

51. Vo observed the blue car fail to stop at a stop sign, which is a violation of the Pennsylvania traffic code.  Tr. 167.

52. Stegena also observed the blue car fail to stop at several clearly present stop signs and observed an inoperable driver's side taillight.  Tr. 114.

53. Vo's vehicle was equipped with a Dashcam, which when activated saves only the last thirty seconds after activation.  The Dashcam activates when the officer either turns the flashing lights on or manually hits record.  The stop sign violations were not recorded. Tr. 168.[3]

54. At approximately 3:30 p.m., agents stopped the blue car and observed Roach making furtive movements.  Tr. 120.  The occupants were removed one at a time, patted down for weapons, and detained.  Defendant's Ex. A.

55. Deandre Gordon and Roach were frisked upon removal from the vehicle, but did not have a weapon on their person; therefore, agents believed a gun was still in the vehicle.  *Id.*

**E.  The Seizure of Gordon and Gunshot Residue Test**

56. Approximately thirty seconds after the stop was initiated, Gordon was the last person removed from the vehicle.  Tr. 178.

57. Immediately prior to his removal from the vehicle, agents observed Gordon actively talking on his cell phone and looking around, as if looking for an avenue of escape. Defendant's Ex. A.

---

[3] Defendant's Exhibit C is an approximately 30-second dashcam video depicting the stop of the blue car.

58. Agents decided to physically remove Gordon from the vehicle, rather than asking him to come out, as with the other two occupants. *Id.*

59. Gordon had a set of rental vehicle keys[4] on his lap which fell to the ground when he exited the vehicle. Defendant's Ex. C. Officers placed the keys back in the vehicle. Defendant's Ex. A.

60. Gordon had his phone in his hand, but an agent placed it back in the blue car. Tr. 178.

61. When Gordon was patted down for weapons, agents found a large quantity of cash in his pants pocket. Defendant's Ex. A.

62. A semi-automatic pistol was seen in plain view on the floor of the rear passenger seat where Roach had been sitting. Defendant's Ex. A.

63. The blue car was secured while agents waited for a tow truck and to obtain a search warrant. *Id.*

64. Deandre Gordon gave agents consent to retrieve his wallet from the vehicle to confirm his identity. The wallet was placed back into the vehicle. *Id.*

65. There were no outstanding warrants for any occupant of the blue car. They remained detained and were transported to Pittsburgh Police headquarters. *Id.*

66. The gunshot residue test was administered to Gordon at Pittsburgh Police headquarters at 4:33 p.m., approximately one hour after Gordon was detained. Government Ex. 57; Transcript of May 26, 2026 hearing.

---

[4]The keys were subsequently determined to be the keys to the Red Ram. Defendant's Ex. A. The record does not reflect when the keys were confirmed to be for the Red Ram.

67. At approximately 6:20 p.m. on August 30, 2024, agents went to the home at 2287 Valera Avenue. Tr. 179.[5]

68. Distelrath prepared an affidavit and at approximately 11:00 p.m. on August 30, 2024, obtained a warrant to search the Valera Avenue home, the Red Ram, Deandre Gordon's car, and Gordon's person.

69. It is undisputed that the affidavit did not mention the 6:20 p.m. search of 2287 Valera Avenue or any of the items discovered during that search. ECF No. 86 at 6.

### III.    Conclusions of Law

The following issues remain for decision by the court: (1) whether the stop of the blue car was supported by reasonable suspicion; (2) whether the detention of Gordon and administration of a gun residue test were supported by probable cause; (3) whether the court should revisit its decision that Gordon did not meet his burden for a *Franks* hearing; and (4) whether count 3 of the second superseding indictment (using a firearm in furtherance of a crime of violence) should be dismissed. The court will address each of these contentions.

    A. The First Motion to Dismiss – The Stop

        General Principles of law

1. The Fourth Amendment protects the public from "unreasonable searches and seizures."

---

[5] There is a dispute about what happened at the home. The government contends that agents performed a protective sweep and secured the home while waiting for a search warrant. ECF No. 88 at 21 n. 15. The defense contends that agents conducted a blatantly illegal warrantless search. ECF No. 86 at 6. The court need not resolve this factual dispute because no evidence from this search was used to obtain the warrant to search that residence.

U.S. Const. amend. IV.

2.  The burden of proof is initially on the defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). After the defendant establishes a basis for his motion (for example, by asserting that a search or seizure occurred without a warrant), the burden shifts to the government. *Id.*

3.  After the burden shifts to the government, the government must prove by a preponderance of the evidence that the seizure was reasonable. *United States v. Lowe,* 791 F.3d 424, 432 n.4 (3d Cir. 2015).

Reasonable suspicion

4.  The reasonable suspicion standard applies to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

5.  The government has the burden to prove by a preponderance of the evidence that a warrantless traffic stop is based on reasonable suspicion. *Wardlow*, 528 U.S. at 123; *United States v. Giles*, No. 1:07-CR-0192-01, 2008 WL 282369, at *7 (M.D. Pa. Jan. 31, 2008).

6.  Courts "accord deference to an officer's judgment of whether criminal activity is taking place with an understanding that 'whether an officer has reasonable suspicion to warrant a stop ... is often an imprecise judgment.'" *Id.* (citation omitted). Courts must "afford significant deference to a law enforcement officer's determination of reasonable suspicion." *United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020).

7.  Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the

12

particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

8. Reasonable suspicion can be based on an officer's reasonable, but incorrect, observations. *Delfin-Colina,* 464 F.3d at 398 ("[A]n officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place.").

9. Reasonable suspicion "is a less demanding standard than probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

10. A police officer who makes a lawful traffic stop may order the occupants to exit the vehicle and conduct a pat down of any occupant of the vehicle, even where there is no suspicion of criminal activity. *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

11. The government met its burden by showing that agents observed the driver of the blue car commit traffic code violations by: (a) going through stop signs; and (b) having an inoperable taillight.  Either violation supports at least reasonable suspicion to conduct the traffic stop of Deandre Gordon's vehicle, even without considering the evidence relating to the controlled buy on August 29, 2024 and the shooting on August 30, 2024.[6]

12. Agents independently were permitted to stop the blue car because they had reasonable suspicion that the occupants were involved in a completed felony.  *See United States v.*

---

[6] Defendant argues that the taillight was not on because the blue car was in "park" when the blue car was stopped at a traffic light in a line of cars.  Stegena and Vo testified credibly that they observed the inoperable taillight while the blue car was being driven in heavy traffic.  Tr. at 114, 167.  Those specific, articulable facts provided at least reasonable suspicion of a traffic violation.  In any event, the agents' credible testimony about the stop sign violations is alone sufficient to support the stop.

*Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").

13. The arresting officers had at least reasonable suspicion that Gordon was armed and committed a felony based on the reports from other agents that Gordon had fired numerous shots at a DEA agent approximately two hours earlier.

14. The government's legitimate and weighty interest in officer safety outweighs the de minimis additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

15. If the officer has a reasonable suspicion that the person subjected to the frisk is armed and dangerous, the officer may conduct a frisk of that person. *Id.*

16. The arresting officers had at least reasonable suspicion that Roach was armed because they saw Roach retrieve a firearm from his car and place it in his waistband, saw Roach pull out a firearm after seeing a passing vehicle on Valera Avenue, and observed Roach make furtive movements in the blue car after the traffic stop was executed.

17. Because the officers reasonably believed Roach was armed and Gordon had committed a felony with a gun, the officers had a reasonable basis to direct all the occupants to exit the vehicle and be frisked for weapons because they reasonably feared for officer safety.

18. The court concludes that officers had at least reasonable suspicion to conduct a *Terry* frisk for weapons.

14

19. Defendant's first motion to suppress evidence (ECF No. 64), which challenged the traffic stop, will be denied.[7]

### B.  Second Motion to Suppress -- Gun Residue Test

#### General Principles of Law

20. "A warrantless arrest violates the Fourth Amendment where the arresting officer lacks probable cause to believe that an offense has been committed." *Acuna-Viales, v. Pasquale*, No. CV 24-1048, 2026 WL 1430845 at *4 (D.N.J. May 21, 2026) (citing *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020)).

21. Conversely, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

#### Seizure of Gordon

22. The only evidence at issue in the second motion to suppress is the gunshot residue test administered after Gordon was arrested without a warrant (ECF No. 86-1).

23. The dispositive issue in defendant's second motion to suppress, therefore, is whether there was probable cause to arrest Gordon without a warrant.

24. As explained in *Harvard*: "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Harvard*, 973 F.3d at 199–200.

25. As recently summarized in *Moore v. Camburn*, No. CV 25-4411, 2026 WL 764144 (E.D. Pa. Mar. 18, 2026):

---

[7] In the motion to suppress, Gordon also argued that the Distelrath Affidavit failed to establish a nexus between the investigation and the home at 2287 Valera Avenue.  The court explained on the record the reasons it denied this aspect of the motion when discussing Gordon's motion for a *Franks* hearing (ECF No. 87 at 49-65).  Nexus will also be addressed *supra* at 24-25.

15

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483. Courts "consider the existence of probable cause via a 'common sense approach' based on the totality of the circumstances, and viewed from the perspective of an objectively reasonable police officer." *Young v. City of Pittsburgh*, 562 F. App'x 135, 140 (3d Cir. 2014) (internal citation omitted). The standard is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Courts view the "totality of the circumstances" in assessing the existence of probable cause to issue a warrant. *Illinois v. Gates*, 462 U.S. 213 (1983).

*Id.* at *4.

26. Under the "collective knowledge" doctrine, "police in one jurisdiction [may] act promptly in reliance on information from another jurisdiction." *United States v. Hensley*, 469 U.S. 221, 231 (1985). The admissibility of evidence uncovered during a search incident to an arrest in reliance on information received from other officers turns on whether those other officers possessed probable cause to make the arrest. It does not turn on whether the arresting officers "were themselves aware of the specific facts which led their colleagues to seek their assistance." *Id.*

27. "Under the 'collective knowledge' doctrine, information known to any one investigating officer is imputed to the officers actually conducting the arrest." *United States v. Brown*, 565 F. App'x 98, 101 (3d Cir. 2014) (citing *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir.2010)).

28. The investigating agents had probable cause to believe that Gordon was involved in the shooting, based upon the following:

- Multiple agents were involved in a controlled buy of narcotics from Gordon on August 29, 2024, the day before the shooting. Agents confirmed Gordon's

16

identity through photos, the CHS identification, cellphone records, and his connection to the home at 2287 Valera Avenue.

- Agents connected Gordon to the Red Ram from which the shots were fired at Palso on August 30, 2024: (a) Gordon drove the Red Ram to the controlled buy location on August 29, 2024, and agents saw the Red Ram parked outside Gordon's home at 2287 Valera Avenue ten minutes later; (b) agents saw the Red Ram at 2287 Valera Avenue twice on the morning of August 30, 2024, including just ninety minutes prior to the shooting; and (c) Palso was located on Valera Avenue on August 30, 2024, when he reported feeling uncomfortable because someone was staring at him from the Red Ram (agents confirmed that the license plate was for the same truck used in the controlled buy the day before).

- Moments later, Palso reported someone was shooting at him from the Red Ram.

- Perry, a detective with thirteen years of experience, testified credibly that she believed it "very likely" that Gordon was involved in the shooting at Palso. Tr. 98.

29. The arresting officers, including Stegena and Vo, learned from the DEA, FBI, and other agencies that Gordon was believed to be the actor who shot at Palso. Tr. 102-103.

30. Stegena and Vo made personal observations that increased their belief that Gordon was involved in the shooting, including the following:

- The Red Ram was discovered unoccupied a short walk from 2287 Valera Avenue shortly after the shooting. Stegena testified based on his experience that criminals often abandon a vehicle close to a haven to which they can walk.

17

Tr. 107.

- The Red Ram was rented by Gordon's brother, Deandre Gordon, but agents saw Deandre Gordon driving a different vehicle on August 30, 2026.

- Officers saw Gordon emerge from 2287 Valera Avenue shortly after the shooting to meet Roach; observed Roach act suspicious and defensive by pulling his gun when an unfamiliar car drove down the street; observed Deandre Gordon drive to 2287 Valera Avenue in a blue car; and saw Gordon get into the blue car while covering his head by wearing a hooded sweatshirt, which in light of the hot weather led the officers to believe he was disguising his appearance.

31. Stegena, a detective with over ten years experience, testified credibly that these circumstances increased his belief that Gordon was involved in the shooting. Tr. 112-114.

32. The inferences drawn by experienced law enforcement professionals can be considered in determining probable cause. *See United States v. Cortez*, 449 U.S. 411, 418 (acknowledging that "a trained officer draws inferences and makes deductions ... that might well elude an untrained person"); *United States v. Rodriguez*, No. CR 3:24-170, 2025 WL 2831953 *4 (M.D. Pa. Oct. 6, 2025), ("inferences [are] inherent to police investigation").

33. After the stop, the arresting officers knew that when Gordon was removed from the blue car, a key to a rental vehicle was retrieved when it fell off Gordon's lap onto the ground.[8]

---

[8] It is undisputed that the key belonged to the Red Ram (ECF No. 86 at 2), but it is unclear when agents confirmed that the key was for the Red Ram. The April 2, 2026 hearing was focused on defendant's original motion to suppress evidence, which challenged the stop of the blue car. The parties stipulated on May 26, 2026, that the same factual record would apply to defendant's subsequent motion to suppress the

34. In sum, there were strong reasons to believe that Gordon exercised dominion and control, both before and after the shooting, over the Red Ram from which shots were fired at Palso.

35. In this case, the arresting agents had probable cause to believe that Gordon committed multiple felonies by shooting at a DEA agent from the Red Ram.

36. Defendant's second motion to suppress (ECF No. 86) will be denied.

C.  Third Motion – Request for Renewed *Franks* hearing

37. The court notes the government's procedural challenges to this motion, but need not address them because the motion fails on its merits.

38. To "overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid," a defendant must first "make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

39. In *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000), the court explained that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting. *Id.* at 787.

---

gun residue test (ECF No. 86).  The parties, therefore, did not address the evidence obtained during Gordon's arrest (i.e., the key, the cellphone and a large wad of cash).  Even without considering that the key belonged to the Red Ram, the court concludes that agents had probable cause to arrest Gordon.

19

40. "[T]o make this preliminary showing [to overcome the general presumption of validity], the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit." *Id.* at 383 n.8 (quoting *Franks*, 438 U.S. at 171).

41. Defendant must make a preliminary showing to satisfy both prongs, i.e., falsity AND materiality. The court may consider the prongs in either order. *See United States v. Gordon*, 664 F. App'x 242, 245 (3d Cir. 2016) (affirming denial of *Franks* motion due to lack of materiality without addressing falsity) ("if a district court determines the defendant has failed to make that showing with respect to either prong, there is no need for the court to proceed any further for the defendant then is not entitled to a hearing, much less suppression."). Here, the court need only consider the materiality prong because it is dispositive.

42. In *Yusuf*, the court explained the procedures for evaluating the materiality of alleged false statements and omissions: "When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the 'falsehood created by an omission by supplying the omitted information to the original affidavit.'" *Yusuf*, 461 F.3d at 384.

43. In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding. *Id.*

44. Even if the defendant proves at a *Franks* hearing that there are statements in a search affidavit which are deliberately or recklessly false, the warrant would still be valid if the

remaining portions of the affidavit are sufficient to support a finding of probable cause. *See Franks*, 438 U.S. at 156, 171–72.

45. Probable cause to issue a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

46. In his original *Franks* motion, Gordon, among other things, argued that the false and material misstatement was that Deandre Gordon was a member of a drug conspiracy. The government admitted that this statement is false. The court considered all the asserted misstatements and omissions and denied the *Franks* motion after explaining, at length, that Gordon failed to satisfy the materiality prong. Tr. ECF No. 87 at 49-65.[9]

47. In his renewed motion for a *Franks* hearing, Gordon argues that another falsity involved an omission (i.e., failing to inform the magistrate judge that agents conducted an allegedly blatant illegal search of the 2287 Valera Avenue home at 6:20 p.m. on August 30, 2024, prior to obtaining the warrant).

48. The defense recognizes that the affidavit did not rely, at all, on any information obtained during the 6:20 p.m. search. The defense argues that the existence of the allegedly improper search should have been placed in the affidavit anyway, because it may have called into question the veracity of the other statements in the affidavit. Gordon did not point to any specific falsehoods (other than those which the court addressed in denying the earlier motion).

49. The government argues that Gordon fell well short of his burden on both prongs of the

---

[9] In conducting its analysis, the court viewed the parties' dispute about whether a driver's license shown to the CHS had Gordon's name on it in the light most favorable to the defense. *See* Tr., ECF No. 87 at 62-63 (even if adding to the affidavit that the drivers license photo had Gordon's name, it would not make a material difference).

*Franks* test.

50. With respect to falsity, the government contends that omitting reference to the search was proper, and perhaps, required. The government cites several decisions for the proposition that the affidavit should not refer to the 6:20 p.m. search. *Segura v. United States*, 468 U.S. 796, 814 (1984) (upholding warrant where no information obtained during the initial entry was used by the agents to secure the warrant); *United States v. Davis*, 383 F. App'x 172, 175–76 (3d Cir. 2010) ("If '[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment,' then the warrant is not tainted by any preceding illegality.") (quoting *Segura*, 468 U.S. at 814).

51. With respect to materiality, the government points out that if the affidavit had referred to the search and the items discovered during the search, the proper remedy would have been for the court to strike those averments. Thus, the affidavit (as corrected to remove any improper references) would be the same as the affidavit actually presented to the magistrate judge.

52. Defendant's position would eviscerate the two-prong *Franks* test, by dispensing with the materiality prong. Contrary to defendant's invitation, the court will not infer (from one or several falsehoods) that all remaining averments in an affidavit are unworthy of credence. The court is required to evaluate the corrected affidavit (regardless how many corrections are required) to determine whether the remainder of the affidavit supports probable cause. Even if a defendant proves at a *Franks* hearing that there are statements in an affidavit which are deliberately or recklessly false, the warrant would still be valid if the remaining portions of the affidavit are sufficient to support a finding of probable

cause. *See Franks*, 438 U.S. at 156, 171–72.

53. The discussion in *Wilson* is instructive. In that case, the officer made numerous, serious misstatements and omissions. The Third Circuit Court of Appeals emphasized that falsity was not enough:

> [T]he only way that Wilson can succeed is if he proffers evidence that Russo recklessly disregarded the truth in his warrant application, *and* that a warrant application based on what Russo should have told the judge would have *lacked* probable cause.
>
> *Wilson*, 212 F.3d at 786 (emphasis in original).

54. In *Wilson* (involving a § 1983 claim), the court found in favor of plaintiff on the falsity prong, but denied relief under the materiality prong, stating: "even if there had not been omissions and misrepresentations in Russo's presentation to Judge Dilts, Wilson would have been arrested." *Id.* at 789.

55. Similarly, in *United States v. Rogers*, No. CR 1:18-19, 2022 WL 2951672, at *3 (W.D. Pa. July 26, 2022), the court explained:

> In order to obtain a *Franks* hearing, the burden is on the defendant to make the requisite preliminary showing that he can satisfy <u>both</u> prongs necessary to be entitled to such a hearing. *Franks*, 438 U.S. at 171-72. Thus, if a defendant fails to make that showing with respect to <u>either</u> prong, the defendant is not entitled to a hearing. *United States v. Gordon*, 664 F. App'x 242, 245 (3d Cir. 2016) (defendant did not make the "substantial preliminary showing" of materiality necessary to warrant a Franks hearing)
>
> *Id.* at *3 (emphasis in original).

56. In other words, materiality is a separate and district prong of the *Franks* test, on which a defendant must make a substantial preliminary showing, independent from the falsity prong.

57. As explained above and on the record (Tr. of 5/26/2026 hearing at 17-35), even

assuming, arguendo, the 6:20 p.m. search was blatantly illegal[10], the affidavit (as corrected to remove and include the other information addressed on the record during the April 7, 2026 hearing) provides sufficient nexus to support probable cause to issue a search warrant for 2287 Valera Avenue.

58. The record reflects that the affidavit (as corrected) contained the following information:

- On August 29, 2024, Gordon sold narcotics to the CHS and the Red Ram Gordon drove to the controlled buy was parked outside 2287 Valera Avenue ten minutes later;

- On August 30, 2024, at approximately 8:22 a.m. and noon, the Red Ram was observed parked outside 2287 Valera Avenue;

- At approximately 1:30 p.m., someone shot at a DEA agent from the Red Ram;

- Shortly after the shooting, the Red Ram was found a short walking distance from 2287 Valera Avenue;

- Gordon was seen at 2287 Valera Avenue minutes later;

- Roach drove to 2287 Valera Avenue, went inside the house with Gordon, exited the house and pulled out a firearm after seeing a passing vehicle;

- Deandre Gordon drove a blue car to 2287 Valera Avenue and Gordon got into the car while attempting to hide his identity with a hoodie on a hot summer day; and

- Gordon was arrested shortly after he left 2287 Valera Avenue while in possession of rental car keys.

59. In *United States v. Stearn*, 597 F.3d 540, 559–60 (3d Cir. 2010), the court explained that

---

[10] The government strenuously objects to this characterization of the search (ECF No. 88 at 21 & n.15).

"a magistrate's task is simply 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 559-60 (*quoting Illinois v. Gates*, 462 U.S. at 238).

60. In sum, the omissions about the earlier search of 2287 Valera Avenue, if they had been included, would have been stricken from the affidavit and, for the reasons set forth on the record (Tr. ECF No. 87), given the totality of the facts and circumstances set forth in the corrected affidavit, a reviewing magistrate would have a reasonable belief that crimes had been committed and there was a fair probability that evidence related to those crimes would be found at 2287 Valera Avenue. *See Illinois v. Gates*, 462 U.S. at 238.

61. The renewed motion for a *Franks* hearing (ECF No. 86) will be denied.

D.   Fourth Motion – Dismissal of Count 3

62. Gordon argues that count 3 (using a firearm in furtherance of a crime of violence) should be dismissed because neither predicate offense (attempted murder, 18 U.S.C. §§ 1113, 1114, and assault with a deadly weapon, 18 U.S.C. § 111) is categorically a "crime of violence."  The defense cites decisions from district courts outside the Third Circuit.  The government cites binding Third Circuit Court of Appeals' precedent.

63. With respect to attempted murder, in *United States v. Smith*, 165 F.4th 751 (3d Cir. 2026), the court stated:

We join our sister courts in [concluding that attempted murder is a crime of violence]: because the Government must always prove an intent to use physical force and a substantial step toward that end, attempted murder of a federal witness always includes an attempted use of force and therefore is a crime of violence under the elements clause.

25

*Id.* at 760.

64. With respect to assault with a deadly weapon, in *United States v. Bullock*, 970 F.3d 210 (3d Cir. 2020), the court concluded that § 111 is divisible and held "18 U.S.C. § 111(b) [assault with a deadly weapon] is categorically a crime of violence under the Sentencing Guidelines." *Id.* at 217.

65. The court is not persuaded by defense counsel's efforts to distinguish *Smith* and *Bullock*. Moreover, to the extent those decisions are not binding precedent, this court is persuaded the rationales of those decisions, applied to the facts of this case, are correct. Accepting defendant's argument that attempted murder and assault with a deadly weapon are not "crimes of violence" would stretch the categorical approach beyond the point of absurdity.

66. The motion to dismiss count 3 will be denied.


IV.    **Conclusion**

After careful consideration of the record and relevant legal authorities, the court concludes that the original and supplemental motions to suppress evidence filed by Gordon (ECF No. 64, 86) will be DENIED. The renewed motion for a *Franks* hearing (ECF No. 86) and motion to dismiss count 3 of the second superseding indictment (ECF No. 85) will be DENIED.


The parties shall continue to meet the deadlines set forth in the trial scheduling order.

An appropriate order will be entered.


                                        BY THE COURT:

June 25, 2026

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge